UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TASHA DELISHEI NORTON,    :
                        :CIVIL ACTION NO. 3:15-CV-701
        Plaintiff,      :
                        :(JUDGE CONABOY)
        v.             :
                        :
CAROLYN W. COLVIN,      :
Acting Commissioner of    :
Social Security,        :
                        :
        Defendant.      :

---

## MEMORANDUM

Here the Court considers Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  Plaintiff filed for benefits in June 2012 alleging disability beginning on May 6, 2011.  (R. 51.) A June 7, 2012, Disability Report indicates that Plaintiff claimed her ability to work was limited by psoriatic arthritis, psoriasis, IBS, GERD, spina bifida occulta, scoliosis, asthma, and depression. (R. 219.)

The Administrative Law Judge ("ALJ") who evaluated the claim, Michele Stolls, concluded the Plaintiff's severe impairments of psoriatic arthritis, spina bifida, osteoarthritis of the back, recurrent hypersomnia, cystic denomatoid right lower lobe and status post resection, migraines/post-traumatic headache, asthma, narcolepsy without cataplexy, major depressive disorder, and attention deficit hyperactivity disorder did not alone or in

combination with other impairments meet or equal the listings.  (R. 54-56.)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy. (R. 56-60.)  The ALJ therefore found Plaintiff was not disabled under the Act.  (R. 61.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred in applying Acquiescence Ruling AR 00-1(4) regarding treatment of another ALJ's decision on a prior period of disability; 2) the ALJ did not properly consider evidence from a prior decision or explain her consideration of such evidence; 3) the ALJ did not properly consider medical evidence regarding Plaintiff's narcolepsy and did not include its effects in her RFC evaluation; 4) the ALJ erred in her evaluation in the treating physician's opinion; and 5) the ALJ erred in her evaluation of Plaintiff's mother's statement.  (Doc. 31 at 20-21.)  After careful consideration of the administrative record and the parties' filings, I conclude Plaintiff's appeal is properly granted.

## I. Background

### A.    Procedural Background

Plaintiff filed this action on April 9, 2015.  (Doc. 1.)  She appeals the denial of benefits made final by the February 11, 2015,

2

Appeals Council denial of her request for review of the ALJ's decision.  (R. 1.)  With its decision, the Appeals Council indicated that it had reviewed additional evidence filed and it found that the information did not provide a basis for changing the ALJ's decision.  (R. 1-2.)  Specifically the Appeals Council stated that it looked at medical records from Geisinger Medical Center dated May 13, 2014, through May 16, 2014, and concluded the information was about a time after the ALJ's September 16, 2013, decision and, therefore, it did not affect the decision about whether Plaintiff was disabled beginning on or before September 16, 2013--consideration of disability for the later period would need to be raised in a new application.  (R. 2.)

Defendant filed her answer and the Social Security Administration transcript on May 7, 2015.  (Docs. 11-24.) Plaintiff filed her supporting brief on September 10, 2015. (Doc. 31.)  Defendant filed her opposition brief on October 9, 2015. (Doc. 32.)  Plaintiff has not filed a reply brief.

**B.   *Factual Background***

Plaintiff was born on October 15, 1991, and was nineteen years old on the alleged disability onset date.  (R. 60.)  She has a high school education and does not have past relevant work.  (*Id.*)

**1.   Impairment Evidence**

Plaintiff states in her supporting brief that her "allegations of error, with respect to the ALJ's evaluation of specific medical

3

conditions, are restricted to one specific condition: [her] narcolepsy." (Doc. 31 at 8.)  Because of this, Plaintiff provides a general background medical history and focuses review of the medical evidence on her narcolepsy condition.  (*Id.*)  The following review will focus primarily on evidence related to Plaintiff's narcolepsy.

As set out by Plaintiff, the medical records begin in 2008 and document a number of impairments which the ALJ has assessed to be of varying severity.  (Doc. 31 at 8; R. 54-56.)  The first reference to sleep disorder problems was in October 2010.  (Doc. 31 at 11.)

Pediatric Neurology Outpatient Notes dated October 27, 2010, indicate that Plaintiff was seen by Glenn A. Stayer, M.D., for evaluation of headaches.  (R. 1086.)  In addition to the headache history, Dr. Stayer noted that Plaintiff reported difficulty sleeping at night--she woke up several times, took a drink of water and went back to bed.  (R. 1086-87.)  He recorded the following medical history:

> She indicated that she had a "spastic bladder" which interrupted her sleep at night.  Mother indicates today that this problem has now resolved.  Tasha has a history of scoliosis and congenital cystic adenomatoid malformation of the right lung possible coagulopathy.  Problems with ADHD, GE reflux disease, irritable bowel syndrome, and spina bifida occulta have been noted. Tasha had a cyst removed under her left breast 1 year ago by Dr. Kim.  Tasha completed her GED 05/26/10.  She would like

4

> to becmoe an author or a journalist in the
> future.  She indicates that she had a job for
> 2 months but missed work secondary to her
> irritable bowel syndrome, GE reflux disease,
> and was fired.  Tasha indicates that her
> headaches have improved and now occur only 2
> or 3 times per month.  When her headaches
> occur, she takes an Axert tablet which seems
> to help.  She indicates that triggers for her
> headaches are not as clear as in the past.
> She suspects that weather changes may
> contribute to her headache.  On a routine
> night, she goes to bed at 9:30 PM and asleep
> by midnight.  She awakens at 7:30 AM.  She
> indicates that she had been on Abilify for
> the last month, prescribed by Dr. Tenenbaum
> (Psychiatry, Wilkes-Barre) for chronic
> anxiety, depression, and possible bipolar
> disorder. . . . Her primary care physician is
> Dr. Joseph Anistranksi.
>
> Mother has concerns that Tasha is having
> spells in which she seems to be in a daze. .
> . . Mother has noted that these episodes
> occur once or twice a day for the last 2
> weeks.

(R. 1087.)  Dr. Stayer's Assessment included "[s]pells, rule out seizures" and "[d]ifficulty maintaining sleep." (R. 1088.)  He requested that Plaintiff have an EEG to assess cerebral activity. (R. 1089.)  He also strongly encouraged followup with Dr. Tenenbaum in psychiatry, vigilant monitoring of symptoms, followup with primary care physician and return to the neurology clinic in six months.  (R. 1089.)

Plaintiff's November 17, 2010, electroencephalogram was "borderline normal" and clinical correlation was recommended.  (R. 1104.)

On February 22, 2012, Plaintiff was seen by Angela M.

5

DeAntonia, M.D., in the Sleep Disorder department at Geisinger South in Wilkes-Barre for followup of her hypersomnia.  (R. 2023.) She had been referred for excessive daytime sleepiness and initially had an "Epworth Sleepiness Scale" of 11/24.  (*Id.*)  At the February visit, Plaintiff's score was 6/24: she would never doze when sitting and reading (score 0); there was a slight chance of dozing when watching TV (score 1); there was a slight chance of dozing when sitting inactive in a public space (score 1); there was a moderate chance of dozing when a passenger in a car for an hour without a break (score 2); there was a moderate chance of dozing when lying down to rest in the afternoon when circumstances permit (score 2); she would never doze when sitting and talking with someone (score 0); she would never doze when sitting quietly after lunch without alcohol (score 0); and she would never doze in a car while stopped for a few minutes in the traffic (score 0).  (R. 2029.)  Dr. DeAntonio reviewed Plaintiff's sleep hygiene and noted that it was improved.  (R. 2024.)  She also noted that Plaintiff reported that she felt much better but occasionally felt tired and she was going to work.  (R. 2024.)   Dr. DeAntonio recorded that Plaintiff's headaches had decreased in frequency and that she felt overall a "marked improvement in her sense of well being."  (*Id.*) The Assessment and Plan stated that Plaintiff's excessive daytime sleepiness or hypersomnia was markedly improved, her bipolar disease and major depression were under much better control with

marked improvement in her daytime symptoms, she was encouraged to continue with good sleep hygiene and continuance of medications, and she would be seen for followup in six months but should call if she had any problems sooner.  (R. 2024-25.)

On May 5, 2012, John J. Della Rosa, Jr., M.D., stated in the Sleep Medicine Outpatient Notes that Plaintiff was referred by Dr. Joseph Anistranski for evaluation of excessive sleepiness.  (R. 2058.)  Plaintiff reported that she had severe excessive sleepiness since March which included falling asleep in conversations with friends, she did not drive for fear of falling asleep, and her mother reported that she had been a bundle of energy but at that time was always sleepy.  (*Id.*)  Dr. Della Rosa noted that other doctors had thought the sleepiness was medication or depression related but the depression was under control and she had stopped taking some of the sedating medications.  (R. 2058-59.)  He noted that Plaintiff continued to take some sedating medications including PRN Zofran and PRN Neurontin for control of migraine headaches.  (R. 2059.)  Plaintiff reported that she was unemployed. (R. 2059.)  In his Review of Systems, Dr. Della Rosa recorded that Plaintiff denied sleep paralysis but complained of weak episodes during the day where she could hardly move and the episodes could happen anytime.  (*Id.*)  His Impression was severe daytime drowsiness of uncertain cause--it could be related to medication, narcolepsy was a consideration as was drug-induced hypersomnia or

idiopathic hypersomnia with long sleep.  (R. 2060.)  Dr. Della Rosa's plan was for polysomnography followed by a multiple sleep latency testing.  (R. 2061.)  Plaintiff was to undergo testing and return in two weeks.  (R. 2062.)

Plaintiff's May 10, 2012, Epworth Sleepiness Scale score was 9/24: there was a slight chance of dozing when sitting and reading (score 1); there was a slight chance of dozing when watching TV (score 1); she would never doze when sitting inactive in a public space (score 0); there was a high chance of dozing when a passenger in a car for an hour without a break (score 3); there was a moderate chance of dozing when lying down to rest in the afternoon when circumstances permit (score 2); she would never doze when sitting and talking with someone (score 0); she would never doze when sitting quietly after lunch without alcohol (score 0); and there was a moderate chance of dozing when in a car while stopped for a few minutes in the traffic (score 2).  (R. 2067.)

On July 16, 2012, Plaintiff underwent testing at the Geisinger Sleep Disorder Center.  (R. 2556.)  Measurement of Plaintiff's "propensity to fall asleep (sleepiness) was abnormal, with sleep in all 5 naps, with a mean sleep latency of 4.2 minutes.  This indicates severe drowsiness. . . . This study supports the diagnosis of narcolepsy, with 3 sleep onset REM episodes."  (R. 2556.)  The Recommendations were that Plaintiff "not drive, operate heavy machinery, or engage in activities that require full

8

attention if feeling sleepy, drowsy, or otherwise impaired." (*Id.*)

Dr. Della Rosa reviewed these findings at Plaintiff's July 25, 2012, office visit, recorded his impression as "[n]arcolepsy without cataplexy," and started Plaintiff on Modafinil 200 mg. (R. 2568.) He noted that he informed Plaintiff of the potential side effects including anxiety, panic disorder, mood swings, headache, dizziness, allergic reaction, rash, nausea, and other side effects. (*Id.*) Plaintiff and her mother were given educational materials on narcolepsy, including the symptoms and the fact that there is no cure for narcolepsy. (*Id.*) Dr. Della Rosa planned to see Plaintiff in two to three months. (*Id.*) On the date of the visit, Plaintiff's Epworth score was 5/24: she would never doze when sitting and reading (score 0); there was a slight chance of dozing when watching TV (score 1); she would never doze when sitting inactive in a public space (score 0); there was a moderate chance of dozing when a passenger in a car for an hour without a break (score 2); there was a moderate chance of dozing when lying down to rest in the afternoon when circumstances permit (score 2); she would never doze when sitting and talking with someone (score 0); she would never doze when sitting quietly after lunch without alcohol (score 0); and she would never doze when in a car while stopped for a few minutes in the traffic (score 0). (R. 2573.)

At her visit on October 12, 2012, Plaintiff reported some benefit from Modafinil--she was still tired but she was socializing

and getting out more often, was not as prone to napping, and had no associated side effects. (R. 2661.) Dr. Della Roas planned to increase the Modafinil to 400 mg. a day, the maximum dose. (R. 2664.) Her Epworth score was 14/24: there was a high chance of dozing when sitting and reading (score 3); there was a high chance of dozing when watching TV (score 3); there was a moderate chance of dozing when sitting inactive in a public space (score 0); she would never doze when a passenger in a car for an hour without a break (score 0); there was a high chance of dozing when lying down to rest in the afternoon when circumstances permit (score 3); there was a moderate chance of dozing when sitting and talking with someone (score 2); there was a slight chance of dozing when sitting quietly after lunch without alcohol (score 1); and she would never doze when in a car while stopped for a few minutes in the traffic (score 0). (R. 2669.)

On January 18, 2013, Plaintiff again saw Dr. Della Rosa. (R. 2672.) Clinic notes indicate that Plaintiff reported she was still tired and fatigued and her symptoms were worse although she was on the maximum dose of modafinil. (*Id.*) Plaintiff said she was more tired than she had ever been, she was sleeping twelve hours at night then got up, took her modafinil, and went back to bed for a one to three hour nap. (*Id.*) Plaintiff's mother corroborated this information. (*Id.*) Dr. Della Rosa noted that Plaintiff and her mother asked about other medications and he discussed Nuvigil which

he thought may provide some benefit. (*Id.*)  His plan was to discontinue modafinil in favor of Nuvigil 250 mg., the maximum dose. (*Id.*)  He added that he may need to go to other stimulant medication in the future. (*Id.*)  Plaintiff's Epworth score was 15/24: there was a moderate chance of dozing when sitting and reading (score 2); there was a high chance of dozing when watching TV (score 3); there was a moderate chance of dozing when sitting inactive in a public space (score 2); there was a high chance of dozing when a passenger in a car for an hour without a break (score 3); there was a high chance of dozing when lying down to rest in the afternoon when circumstances permit (score 3); she would never doze when sitting and talking with someone (score 0); there was a slight chance of dozing when sitting quietly after lunch without alcohol (score 1); and there was a slight chance of dozing when in a car while stopped for a few minutes in the traffic (score 1). (R. 2680.)

On April 1, 2013, Dr. Della Rosa noted in the "Social History Narrative" portion of his office visit notes that Plaintiff was disabled due to severe narcolepsy. (R. 2686.)  He recorded the following Impression: "Narcolepsy without cataplexy, confirmed by multiple sleep latency testing.  Provigil [modafinil] ineffective, and Nuvagil could not be used because of insurance denial.  She is not a candidate for Adderall, Dexadrine, or Ritalin, due to the potential for psychiatric side effects, and the same goes for

Xyrem." (R. 2686.) Dr. Della Rosa set out the following Plan: "No treatment at the present time. The patient does not drive a motor vehicle, and she should not be doing so, given her severe narcolepsy which remains untreated right now. Followup in sleep clinic in 6 months." (*Id.*) At this visit, Plaintiff's Epworth score was 17/24: there was a moderate chance of dozing when sitting and reading (score 2); there was a high chance of dozing when watching TV (score 3); there was a slight chance of dozing when sitting inactive in a public space (score 1); there was a high chance of dozing when a passenger in a car for an hour without a break (score 3); there was a high chance of dozing when lying down to rest in the afternoon when circumstances permit (score 3); there was a slight chance of dozing when sitting and talking with someone (score 1); there was a moderate chance of dozing when sitting quietly after lunch without alcohol (score 2); and there was a moderate chance of dozing when in a car while stopped for a few minutes in the traffic (score 1). (R. 2691.)

**2.   Opinion Evidence**

On October 15, 2012, Dr. Della Roso opined in a welfare disability form that Plaintiff was temporarily disabled for twelve months or more: he noted the disability began on October 12, 2012, and he expected it to last until October 12, 2013. (R. 2381.) Dr. Della Rosa's diagnosis was narcolepsy and he noted that his assessment was based on physical examination, review of medical

records, clinical history, and appropriate tests and diagnostic procedures.[1]  (*Id.*)

At a Geisinger Comprehensive Weight Management Clinic Consultation on March 27, 2013, Jennifer E. Francoschelli, D.O., stated in the Social History Narrative portion of her report "[d]isabled due to narcolepsy."  (R. 2686.)  At the visit, Plaintiff's mother reported that Plaintiff was on Provigil but it did not work well.  (R. 3002.)  Dr. Francoschelli recorded that Plaintiff was up for about two to four hours during the day "at best," she sleeps the rest of the day and is up during the nighttime watching tv.  (*Id.*)

The Social History Narrative portion of Dr. Della Rosa's April 1, 2013, office notes, states "[d]isabled due to narcolepsy."  (R. 2686.)

## 3.   **Third Party Function Report**

Plaintiff's mother, Teresa A. Breustedt, completed a Function Report - Adult - Third Party on June 21, 2012.  (R. 234-41.)  Her mother stated that Plaintiff slept most of the time but she did not relate this to narcolepsy.  (R. 235, 238.)

## 4.   **Hearing Testimony**

Plaintiff testified on June 6, 2013, that she stopped working in March 2012 because she was "getting sexually harassed."  (R.

---

[1]  The form provided a check-the-box assessment basis.  (R. 2381.)

13

98.)  She stated that since that time she has looked for work at nursing homes and fast-food restaurants but no one called her back. (R. 100.)  When asked by the ALJ whether she thought she could work at one of these places, Plaintiff responded "I think I might be able to."  (*Id.*)  Plaintiff testified that she had adjusted her sleep patterns during the preceding month and she found this was better for her.  (R. 103-04.)

5.   **ALJ Decision**

By decision of September 16, 2013, ALJ Stolls determined that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date of May 6, 2011, through the date of the decision.  (R. 61.)  She made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.
>
> 2.   The claimant engaged in substantial gainful activity (SGA) during the following periods: October 2011 through December 2011 (20 CFR 404.1520(b), 404.1571 *et seq*. 416.920(b) and 416.971 *et seq*.).
>
> 3.   However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
>
> 4.   The claimant has the following severe impairments; psoriatic arthritis; spina bifida; osteoarthritis of the back;

14

recurrent hypersomnia; cystic
adenomatoid right lower lobe and status
post resection; migraines/post-traumatic
headache; asthma; narcolepsy without
cataplexy; major depressive disorder;
generalized anxiety disorder; attention
deficit hyperactivity disorder (20 CFR
404.1520(c) and 416.920(c)).

5.    The claimant does not have an impairment
or combination of impairments that meets
or medically equals the severity of one
of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926).

6.    After careful consideration of the
entire record, the undersigned finds
that the claimant has the residual
functional capacity to perform sedentary
work as defined in 20 CFR 404.1567(a)
and 416.967(a) except the claimant would
be additionally limited to occupations
requiring no more than occasional
postural maneuvers such as balancing,
stooping, kneeling, crouching, and
climbing ramps and stairs, but she must
avoid occupations that require climbing
on ladders, ropes, and scaffolds or
crawling.  She is limited to occupations
requiring no more than occasional
pushing or pulling with the upper and
lower extremities, to include the
operation of hand levers and pedals.
She must avoid concentrated prolonged
exposure to fumes, odors, dusts, gases,
environments with poor ventilation, and
temperature extremes or extreme dampness
and humidity.  She would be limited to
occupations that do not require exposure
to hazards such as dangerous machinery
and unprotected heights.  She is limited
to occupations requiring no more than
simple routine tasks, not performed in a
fast-paced production environment,
involving only simple work related
decisions and, in general, relatively

few workplace changes.

7.  The claimant has no past relevant work
    (20 CFR 404.1565 and 416.965).

8.  The claimant was born on October 15,
    1991 and was 19 years old, which is
    defined as a younger individual age 18-
    44, on the alleged disability onset date
    (20 404.1563 and 416.963).

9.  The claimant has at least a high school
    education and is able to communicate in
    English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an
    issue because the claimant does not have
    past relevant work (20 CFR 404.1568 and
    416.968).

11. Considering the claimant's age,
    education, work experience, and residual
    functional capacity, there are jobs that
    exist in significant numbers in the
    national economy that the claimant can
    perform (20 CFR 404.1569, 404.1569(a),
    416.969, and 416.969(a)).

12. The claimant has not been under a
    disability, as defined in the Social
    Security Act, from May 6, 2011, through
    the date of this decision (20 CFR
    404.1520(g) and 416.910(g)).

(R. 54-61.)

    Regarding Plaintiff's narcolepsy, ALJ Stolls noted that

Plaintiff was not taking any medication for narcolepsy.  (R. 57.)

However, ALJ Stolls also states that Plaintiff

    is prescribed modafinil 200mg once in the
    morning and reports that she is still tired,
    she is socializing and getting out of the
    house more often.  She is not as prone to
    napping and feels the medication is
    beneficial.  A follow up in early 2013 found

16

> the claimant stopped taking her medications
> and was sleeping more (Exhibit B27F/27).

(R. 58.)

ALJ Stolls afforded little weight to opinion evidence related to narcolepsy. She noted that Dr. Della Rosa's welfare disability form suggested temporary disability, did not contain a full functional analysis and the records do not support disability. (R. 59.) Dr. Francoschelli's opinion that Plaintiff was disabled due to narcolepsy was afforded little weight "because the evidence regarding the claimant's narcolepsy does not support this level of severity" and "the claimant testified that her sleeping habits have improved." (R. 59.)

Concerning Plaintiff's mother's third party function report, the ALJ did not give it significant weight because she was not medically trained and could not be considered a disinterested third party. (R. 59.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate

---

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 60-61.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality

19

> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an

20

exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v.*

*Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

<u>**IV. Discussion**</u>

*A. General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred in applying Acquiescence Ruling AR 00-1(4) regarding treatment of another ALJ's decision on a prior period of disability; 2) the ALJ did not properly consider evidence from a prior decision or explain her consideration of such evidence; 3) the ALJ did not properly consider medical evidence regarding Plaintiff's narcolepsy and did not include its effects in her RFC evaluation; 4) the ALJ erred in her evaluation in the treating physician's opinion; and 5) the ALJ erred in her evaluation of Plaintiff's mother's statement.  (Doc. 31 at 20-21.)  Because I conclude the ALJ's consideration of Plaintiff's narcolepsy is lacking, I will first address the claimed errors related to this issue.

**1.   Consideration of Medical Evidence Related to Narcolepsy**

Plaintiff claims the ALJ erred in her consideration of medical evidence related to narcolepsy.  (Doc. 31 at 28.) First, she claims the ALJ's opinion is misleading with respect to the severity of the condition.  (*Id.*)  I conclude that the ALJ did not properly

consider evidence related to Plaintiff's narcolepsy because she did not analyze certain probative evidence.

As set out in *Kent*, 710 F.2d at 114, and explained above, it is necessary for the Secretary to analyze all probative evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 406. The ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.

Although the ALJ need not undertake an exhaustive discussion of all the evidence, *Knepp*, 204 F.3d at 83, here the ALJ did not discuss, or discussed out of context, probative evidence related to Plaintiff's narcolepsy and its effects on her functioning. ALJ Stolls devoted a paragraph to consideration of this severe impairment:

> The claimant's narcolepsy was diagnosed later in 2012. At a sleep disorder clinic she was diagnosed with narcolepsy without cataplexy with a mean sleep latency of 4.2

24

> minutes with 3 sleep onset REM episodes
> (Exhibit B27F/2).  She reported that she gets
> at least 8 hours of sleep per night.
> However, she is prescribed modafinil 200mg.
> once in the morning and reports that although
> she is still tired, she is socializing more
> and getting out of the house more often.  She
> is not as prone to napping and feels the
> medication is beneficial.  A follow up in
> early 2013 found the claimant stopped taking
> her medications and was sleeping more
> (Exhibit B27F/27).

(R. 57-58.)

The incompleteness of ALJ Stolls' review of narcolepsy evidence is demonstrated by a review of the evidence omitted from this brief discussion.  Exhibit B27F/2 refers to Plaintiff's visit with Dr. Della Rosa on October 12, 2014.  (R. 2661.)  The ALJ does not acknowledge that Dr. Della Rosa determined that Plaintiff had a partial benefit from modafinil 200mg and he planned to increase it to 400mg a day, the maximum dose.  (R. 2664.)  More importantly, the ALJ does not review evidence from Plaintiff's January 18, 2013, visit with Dr. Della Rosa where Plaintiff reported that she was worse and her mother corroborated this, including the fact that she was sleeping twelve hours per night, getting up briefly and then going back to bed for a one to three hour nap.  (R. 2672.)  Dr. Della Rosa determined that modafinil was "no longer effective." (R. 2675.)  He discontinued it in favor of Nuvigil and noted that Plaintiff might need to go to other stimulant medication in the future.  (*Id.*)  Most importantly, the ALJ's portrayal of Plaintiff's next visit with Dr. Della Rosa is woefully incomplete.

25

ALJ Stolls' reference to an early 2013 followup relates to Plaintiff's April 1, 2013, visit with Dr. Della Rosa.  (R. 58, 2686.)  While it is true that Plaintiff "stopped taking her medications," Dr. Della Rosa recorded that she did so because "Provigil [modafinil] ineffective, and Nuvigil could not be used because of insurance denial."  (*Id.*)   He added that Plaintiff was not a candidate for other medications because of the potential for psychiatric side effects, and he had no plan for treatment "at the present time."  (R. 2686.)  He characterized Plaintiff's narcolepsy as "severe" and in the "Social History Narrative" portion of the report, he notes "[d]isabled due to narcolepsy."  (*Id.*)  Thus, while the ALJ portrays a claimant who stopped taking medication for no reason, the records show that there was no medication available to Plaintiff for her severe condition confirmed by sleep latency testing which her treating specialist deemed disabling at the time. (R. 58, 2686.)

This review of evidence related to Plaintiff's narcolepsy indicates that the ALJ failed to analyze probative evidence.  It cannot be determined in the circumstances presented here that her failure to do so is harmless error.  Therefore, remand is required for proper consideration of evidence related to Plaintiff's narcolepsy and the effects of this severe impairment on her ability to sustain gainful employment.

I also note that the ALJ did not err in assigning little

weight to Dr. Della Rosa's check-the-box Pennsylvania Department of Public Welfare form opinion in that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).   However, because remand is required for further consideration of Plaintiff's narcolepsy, the ALJ should revisit her reasons for discounting the opinion in that it was rendered in October 2012--before Plaintiff's condition worsened and no treatment was available for what Dr. Della Rosa considered a severe, disabling condition as recorded in his April 1, 2013, treatment notes.   (R. 2686.)   Furthermore, because the ALJ must analyze all evidence and reconsider the limiting effects of Plaintiff's narcolepsy clarification and further development of the record may be required and her statement that "the records do not support disability" is subject to reassessment.

**2.   Remaining Errors**

Because I have determined that remand is required, I will just briefly discuss Plaintiff's remaining claimed errors.

Regarding her first claimed error, the harm specifically noted as a result of the ALJ's alleged failure to provide a *de novo* review by giving significant weight to a prior ALJ decision is that the narcolepsy diagnosis occurred after the previous decision dated June 10, 2010.   (Doc. 31 at 22.)   Because remand is required for consideration of evidence related to narcolepsy, the harm cited will be addressed.

Regarding her second claimed error that the ALJ did not comply with HALLEX I-2-6-58, I agree with Defendant that compliance with

HALLEX, a Social Security internal guidance tool, "is not judicially enforceable or binding" on the Social Security administration, and Plaintiff has not shown that she suffered harm as a result of claimed noncompliance.  (Doc. 32 at 16.)

Regarding her fifth claimed error, Plaintiff's criticism of the ALJ's consideration of her mother's function report is valid in part: although Plaintiff's mother is not medically trained her lay observation of Plaintiff's symptoms should not be discounted without further explanation as to how the information provided is inconsistent with medical reports.  (*See* R. 59.)  This is particularly so because Plaintiff lives with her mother, her mother accompanies her to most medical visits, and her observations about sleepiness made in June 2012 may be relevant to and consistent with Plaintiff's narcolepsy diagnosis confirmed by Dr. Della Rosa in July 2012.  (R. 235, 238, 2556.)

### V. Conclusion

For the reasons discussed above, I conclude that remand of this matter is necessary for further consideration in accordance with this Memorandum.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: October 26, 2015